UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

UNITED STATES OF AMERICA,

      -against-                              04 CR 1065 (CM)

PAUL RYAN DOUGLAS,

      Defendant.

_____x

DECISION DENYING MOTION FOR A NEW TRIAL

McMahon, J.:

Defendant has filed a motion asking the Court to grant him a new trial, pursuant to Fed. R.

Crim. P. 33, on the ground that the Government failed to comply with its obligations under *Brady*

v. *Maryland*, 373 U.S. 83 (1963), by not turning over prior statements of two of its trial witnesses

earlier than three days before trial and four days before their testimony. The Government contends

that it did not suppress any material evidence and that it complied fully with its Brady obligations.

The motion is denied.

## **BACKGROUND**

### A.  Defendant's Trial

On December 14, 2005, Paul Ryan Douglas was found guilty by a jury of attempting to enter

1915-25 Central Park Avenue in Yonkers with intent to steal money from the Citibank automated

teller machines located there, in violation of 18 U.S.C. § 2113(a) (Count One), and of killing Milton

Moran Jr., an ATM repair technician, in committing and attempting to avoid apprehension for

committing the crime charged in Count One, in violation of 18 U.S.C. §§ 2113(e) (Count Two).

Both crimes occurred on the morning of April 22, 2004.

1. The Government's Case

On December 5, 2005, after jury selection and opening statements, the Government called its first witnesses.

The Government's proof established that Douglas was a former Brinks employee who had delivered cash to the Citibank ATMs at 1915-25 Central Park Avenue, and thus was familiar with the keys and codes needed to gain access to the cash in those machines, as well as the fact that $400,000 to $500,000 was typically delivered to those ATMs on Thursday mornings. (Trial Transcript ("Tr.") 211-13, 221-25, 293). The evidence also established that defendant, who lived in Brooklyn, was at the Yonkers Citibank facility on the morning of Thursday, April 22, 2004 -- when Mr. Moran was killed -- and that, among other things, defendant brought with him a loaded shotgun, a bulletproof vest, a suitcase packed with men's clothing and his recently expired passport. (Tr. 85-86, 88, 91-92).

The evidence further established that Mr. Moran walked out of 1915-25 Central Park Avenue a few minutes after 9 a.m., on April 22, after working on a printer problem in one of the Citibank ATM machines. (Tr. 249-50; 296-97). Approximately an hour and a half later he was found dead in the trunk of his car, with extensive bruising on the side of his face and head, and duct tape wrapped tightly around his mouth. (Tr. 45, 49, 66-67). The keys that Mr. Moran used earlier that morning to get access to the back of the Citibank ATMs -- and that, along with certain codes, would permit access to the cash in the ATM machines -- were missing. (Tr. 76-78, 221-22, 229). The evidence also established that a Brinks armored van in fact delivered cash to those ATMs on the morning of April 22, but that the Brinks team delayed going inside the facility, waiting outside 1915-25 Central Park Avenue for 30 to 40 minutes while two employees discussed the sale of a car.

(Tr. 230, 240).

The testimony of Wayne Haye, Douglas's friend from childhood, established that Douglas had admitted, in a conversation with Haye and Douglas's cousin Vaughan Nembhard, that he was at the Yonkers Citibank site on the morning of April 22, and that he was there to steal money from the ATM machines after they were loaded with money, using keys or codes obtained from an ATM technician. (Tr. 368-71). Haye also testified that Douglas said the plan was to stage what appeared to be a robbery, with the ATM technician tied up and roughed up. (Tr. 371-72). Haye's testimony further established that Douglas admitted that he had tightened the binding around Mr. Moran's face and hit him on the face or forehead, and that there was a delay in the delivery of the money. (Tr. 372-73). In addition, Haye's testimony established that Douglas admitted he had gone to see if the people delivering the money had arrived, and when he returned found Mr. Moran unresponsive. (Tr. 373-74). Douglas also admitted to Haye that he noticed people watching him, panicked, put Mr. Moran's in the trunk of a car and fled in a Lexus SUV. (Tr. 374-75). Douglas did not mention to Haye anyone other than himself and the ATM technician being involved in the plan to steal money or being involved at the scene. (Tr. 377).

Vaughan Nembhard, Douglas's cousin, who testified that he found it difficult to recall what Douglas said (Tr. 346), nonetheless remembered that Douglas said he was involved in a plan to stage what would appear to be a bank robbery, with Douglas getting the money while "Milton," a Brinks employee, was put in a situation where it looked as if he could not help but let the bank robbery occur. (Tr. 344-47). He also remembered that Douglas said he had gone to get the money, but was not able to, and when he returned found Milton with stuff coming out of his nostrils. (Tr. 348-49, 351). Nembhard also testified that Douglas said Milton fell out of the Lexus Douglas was driving,

and Douglas then panicked, put Milton in Milton's car and drove from the scene. (Tr. 350). Like Haye, Nembhard testified that Douglas mentioned no one other than himself and Milton being involved in a plan to take money, or being involved at the scene. (Tr. 351).

Consistent with what he told Haye and Nembhard, when Douglas turned himself in to the police in Florida, he told Officer Thomas Blanchard that he had been involved with a bank robbery in New York and that a man had been killed. (Tr. 301-02).

The Government's case also established, through the testimony of a medical examiner, Dr. Louis Roh, that the primary cause of Mr. Moran's death was asphyxia, and an additional cause was blunt force trauma. (Tr. 404). Dr. Roh explained that the duct tape tied tightly across Mr. Moran's mouth prevented him from breathing through his mouth and impeded his breathing through his nose. (Tr. 403-06). He also explained that he found in Mr. Moran's lungs and nose froth, or mucous mixed with air, which is produced during a struggle to breathe. (Tr. 402, 406). That froth, combined with the duct tape sealing his mouth and impeding breathing through his nose, was sufficient to suffocate Mr. Moran. (Tr. 406).

Thus the Government's proof established, in significant part through Douglas's own admissions, that he had been at the Yonkers Citibank facility to steal money from the ATM machines there, and that it was he who took the steps that led to Mr. Moran's death, particularly tightening the duct tape around his mouth.

### 2. Vitetta and Sarin

John Vitetta and Marilyn Sarin, employees of a medical office located in the same building as the ATM facility where Moran spent his final moments, were called as witnesses on December 6, 2005. This was four days after the production of Giglio impeachment material relating to their

testimony.

Vitetta and Sarin were eyewitnesses to the final moments of the drama that took place at 1915-25 Central Park Avenue on April 22. Their testimony was consistent with Douglas' admissions to Haye and Nembhard – namely, that he dumped Moran's body in the trunk of the victim's own car, then fled the scene in his girlfriend's SUV, which he was driving that day. Vitetta also testified that Douglas moved Moran's car from one side of the parking lot to the other shortly before he dumped his body.

John Vitetta was a medical assistant in a doctors' office located at 1915-25 Central Park Avenue. (Tr. 133-35). During the morning of April 22, after canceling patient appointments because the doctor he worked for called in sick (Tr. 135-36), Vitetta went into the parking lot to work on his car, and stayed there for a period of no more than five or ten minutes. (Tr. 148). In the parking lot Vitetta noticed a car idling in a parking space directly behind the building, and looked at the one person in it. (Tr. 139-41). Vitetta did not notice any other cars or people in the parking lot. He did notice that the cars between his and the car that was idling were empty and were not idling. (Tr. 160). Vitetta saw Douglas move the idling car, which was Mr. Moran's car, toward a parking space next to an SUV. (Tr. 141-44). Vitetta then saw Douglas drag a body between the SUV and Moran' car and dump that body into the trunk of Moran's car. (Tr. 139-47). Vitetta ran inside his office and called 911. (Tr. 148). There were no windows facing the parking lot from the office. (Tr. 148, 171; *see* Government Exhibit ("GX") 7).

Vitetta identified Douglas both in a photo array and in court. (Tr. 147, 151).

Marilyn Sarin, who was employed by the same doctors' office, (Tr. 172), first testified during a hearing outside the jury's presence. At the conclusion of the hearing, I ruled that Sarin had

not seen the defendant's photo in the press prior to identifying Douglas in a photo array. (Tr. 121-29). In the jury's presence Sarin testified that, after hearing Vitetta call 911, she ran out to the parking lot. (Tr. 172-73). Sarin saw a man driving a black Lexus SUV out of the entrance to the parking lot at 1915-25 Central Park Avenue. (Tr. 172-78). Sarin did not see anyone else in the parking lot (Tr. 179-80, 188). She identified Douglas in a photo array, but not in court. (Tr. 178-79). Sarin testified that she wrote down the license plate number of the SUV. (Tr. 180). The plate matched a car belonging to Jacqueline Broomes, who lived with Douglas in Brooklyn, and who had left the SUV in his custody the previous day when he dropped her off at the airport for a vacation in the Bahamas. (Tr. 198-99; GX 50). When the SUV was found, it contained, among other things, a loaded shotgun, a bullet proof vest, duct tape, a packed suit case and identification documents, including a Jamaican passport. (Tr. 85-86, 92).

3. The Defense Case

Douglas took the stand in his own defense. He admitted that he was at 1915-25 Central Park Avenue on the morning of April 22, that he drove Broomes' Lexus SUV to get there, and that he came there with a loaded shotgun, bulletproof vest and duct tape. (Tr. at 490, 498, 522). He also admitted that he dragged Moran's body from the SUV and dumped it into the back of Moran's car, just as Vitetta described. (Tr. 549-50). He also admitted that he then drove out the entrance to the parking lot, just as Sarin described. (Tr. 550-51).

The only bit of testimony given by Vitetta or Sarin that Douglas did not confirm concerned how Moran's car got into the parking space where it was found. According to Douglas, an armed man, referred to by the prosecution during trial as the "mystery man," forced Moran to drive his car from the south side of the parking lot (where Moran had allegedly parked in order to enter the

Citibank facility) to the space where it was found on the north side of the parking lot. (Tr. 515-16).

Much of Douglas's testimony was devoted to setting the scene for a defense of coercion. Douglas described in great detail how an unknown person, whom defendant could describe only vaguely as darker skinned than himself and with dreads or twists in his hair, had been extorting him for three months. (*See* Tr. 453-74). According to Douglas, this man somehow figured out that Douglas had once worked for Brinks, even though he was not working for Brinks at the time of the alleged extortion. (Tr. 475-76). The man allegedly forced Douglas to show him the Yonkers Citibank site. (Tr. 479-80). When they arrived, it was this unidentified man, according to Douglas, who was responsible for all the criminal conduct that occurred, including the efforts to enter the bank and the killing of Moran. Douglas did admit to helping this man in a number of ways: he agreed to show him the Citibank facility even though he knew the man was interested in robbing banks (Tr. 622-23); he gave the man information that he knew could help him to rob Brinks (Tr. 624); he gave the man more information once they were at the Yonkers site, to help him case the Citibank facility for a robbery (Tr. 629-31); he identified Moran to the man (Tr. 636-37, 754); he drove the SUV to where the man was holding Moran hostage thereby giving him a vehicle with tinted windows in which to hold the victim hostage (Tr. 645-46, 754), and when asked by the man for rope to use in tying up Moran, he offered duct tape instead, which the man used to cover Moran's mouth. (Tr. 522, 647-48, 754).

Douglas claims that all of his conduct was coerced by threats from this unknown extortionist. According to Douglas, the extortionist was armed with a handgun and had in the past threatened to kill his family members. (Tr. 455, 457, 458, 462, 474). Douglas also claimed that the "extortionist" put a gun to his head in the bank parking lot to get defendant to comply with his demands. (Tr. 509-

510). However, on cross-examination, Douglas admitted that there were numerous times when he could have escaped or called for help, but did not. (*See, e.g.*, Tr. 627, 633-34, 641, 643, 652-53).

According to Douglas, after engaging in his criminal conduct, the man fled the scene on foot. He was gone for "a while" before Douglas began to move Moran's body from the SUV to the trunk of Moran's own car (Tr. 545-47). Douglas's story establishes that the "man" was long gone when Vitetta saw him dump Moran's body in the trunk of the car, as well as when Sarin saw the SUV leave the parking lot.

The defense also called FBI Special Agent Kevin Conroy. (Tr. 770-77). Agent Conroy, although not assigned to the Douglas case, interviewed Vitetta and Sarin in April 2004. (Tr. 771; *see* 3506-A and 3506-B (annexed as Exhibit D to Calhoun Aff.)). Defense counsel, focusing on a single sentence in Agent Conroy's report of his interview with Vitetta, asked if Vitetta had said, "The driver who was in the vehicle that was parked next to his car initially and then later backed into a spot next to the SUV, was a darker-skinned male than the person he saw place the body in the trunk." (Tr. 771; *see* 3505-B (annexed as Exhibit A to Affirmation of Clinton W. Calhoun, III, Esq., submitted in connection with defendant's motion ("Calhoun Aff.")). Agent Conroy had no independent recollection of what Vitetta had told him. (Tr. 771-72). Even after looking at the typewritten account of the interview and his handwritten notes, (*see* 3505-B, 3505-C (annexed as Exhibit B to Calhoun Aff.)), Agent Conroy had no memory of what Vitetta said. He acknowledged that he had written the words defense counsel read (Tr. 772), but testified that it was "kind of confusing. You know, I don't actually understand what I was trying to say myself, to be honest with you." (Tr. 774).

The evidence of Mr. Douglas' guilt was overwhelming. It took the jury less than four hours

to convict Douglas of both charges against him.  (*See* Tr. 969, 972, 975, 977).

B.  Pretrial Disclosures

Both the Government and the defense agree to the chronology of the relevant disclosures:

By letter dated November 4, 2005, the Government provided defendant with certain disclosures.  After listing some eleven different categories of evidence being disclosed, the Government wrote:

> In addition, although the Government does not view all of the following as Brady material, in an excess of caution we disclose that:
>
> 1.  Six days after the events that are the subject of the above referenced indictment, a witness named Leticia Graham reported that half of the black SUV that exited the parking lot was a different color than the rest of the vehicle.  Ms. Graham also described the driver as possibly white or a light-skinned black male with a beard, and heavyset, possibly 240-250 pounds.

(Exhibit E to Calhoun Aff. at 2).  Ms. Graham was not called as a trial witness by either side.

On Friday, December 2, 2005, three days before jury selection, the Government produced 3500 and *Giglio* material for its trial witnesses to defense counsel.  (Affirmation of Karen B. Konigsberg, dated January 20, 2006, ("Konigsberg Aff."), ¶ 2.).  These included all prior statements of the witnesses in the form of memoranda and notes of interviews, and, in the case of Wayne Haye and Vaughan Nembhard, grand jury testimony.  There were fewer than 290 pages of 3500/Giglio material.  (*Id.*).

 The 3500/*Giglio* material was produced in a redweld with the pages that were relevant to each witness separately paper-clipped for each witness.  (Konigsberg Aff., ¶ 3).  The material for John Vitetta totaled 11 pages.  Marilyn Sarin's 3500/*Giglio* material totaled 8 pages. One of those eight pages was not turned over until Saturday December 3, 2005. (*Id.*).

In addition, on December 2, 2005, the Government told defense counsel when Vitetta and

Sarin were expected to testify. (Konigsberg Aff., ¶ 2). They actually testified on December 6.

## Applicable Legal Standards

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Because motions for a new trial are disfavored in this Circuit, *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), district courts, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds a real concern that an innocent person may have been convicted. *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). It is only when it appears that an injustice has been done that there is a need for a new trial in the interest of justice. *Id.* As such, a district court must exercise its Rule 33 authority sparingly and only in the most extraordinary circumstances. *Id.; Romero* v. *United States*, 28 F.3d 267, 268 (2d Cir. 1994).

A defendant seeking a new trial on the basis of an alleged *Brady* violation bears the burden of demonstrating both that the Government suppressed exculpatory information and that this information was material. Allegedly suppressed evidence is material, for these purposes, only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States* v. *Brunshtein*, 344 F.3d 91, 101 (2d Cir. 2003) (citations omitted).

The Government has a duty to disclose evidence favorable to the accused when it is material to guilt or punishment. *See Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). This duty covers not only exculpatory information, but also information that could be used to impeach a key Government witnesses. *See Giglio* v. *United States*, 405 U.S. 150 (1972).

The Second Circuit has made it clear that "*Brady* does not . . . require the prosecution to

disclose *all* exculpatory and impeachment material; it need disclose only material 'that, if suppressed, would deprive the defendant of a fair trial.'" *United States* v. *Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (*quoting United States* v. *Bagley*, 473 U.S. 667, 675 (1985)). Under *Brady* and its progeny, a defendant is deprived of a fair trial only where there is a reasonable probability that the government's suppression affected the outcome of the case. *Id.* at 135; *Bagley*, 473 U.S. at 682), or where the suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Kyles* v. *Whitley*, 514 U.S. 419, 435 (1995)).

To make out a *Brady* violation, a defendant must show: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice. *Coppa*, 267 F.3d at 140. This assessment of prejudice requires a reviewing court to analyze the allegedly favorable information in light of the entire record. *United States* v. *Payne*, 63 F.3d 1200, 1210-11 (2d Cir. 1995).

The Government's duty of disclosure, and the timing thereof, is assessed retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial. *Coppa*, 267 F.3d at 140; *Strickler* v. *Greene*, 527 U.S. 263, 281 (1999)). This "result-affecting test . . . obliges a prosecutor to make a prediction as to whether a reasonable probability will exist that the outcome would have been different if disclosure had been made." *Coppa,* 267 F. 3d at 142. There is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. *Strickler* v. *Greene*, 527 U.S. at 281.

The "result-affecting" test also drives the timing of disclosure. The prosecutor must disclose material exculpatory and impeachment information no later than the point at which a reasonable

probability will exist that the outcome would have been different if an earlier disclosure had been made. *Coppa*, 267 F.3d at 142. The law requires only that *Brady* material be disclosed in time for its effective use at trial. *Id.*

Finally, the "purpose [of *Brady*] is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States* v. *Bagley*, 473 U.S. 667, 675 (1985). Thus, evidence is not suppressed within the meaning of *Brady* if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence. *United States* v. *LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)(citations omitted); *accord United States* v. *Brown*, 582 F.2d 197, 200 (2d Cir. 1978).

## The Government Did Not Violate *Brady*

### 1. Suppression

The prior statements of Vitetta and Sarin were turned over to the defense prior to trial, one business day and three calendar days before the start of trial, and two business days and four calendar days before those witnesses testified. (Calhoun Aff. at ¶ 4; Tr. 121-28, 172-97 (testimony of Marilyn Sarin); 132-71 (testimony of John Vitetta)).[1] The question is whether that was too late for the defense to have made effective use of the information they contained. The answer is no.

Whether arguably exculpatory or impeachment information can be effectively used at trial is a function of the circumstances in which it is turned over to the defense. For example, in *United States v. Gil*, 297 F. 3d 93, (2d Circ. 2002), the two-page memo containing exculpatory information

---

[1] As noted above, one of the documents, 3506-E, was disclosed one day later, *i.e.*, on Saturday, December 3, two calendar days before the start of trial and three calendar days before Sarin's testimony. This is one of two documents that contains a reference to Vitetta's prior inconsistent statement. The other, a second document, was handed over the day earlier.

that went to he central issue in the case – whether an agreement that defendant claims he had made in fact existed – was part of a production of more than 2,700 pages made "the Friday before the Monday trial." 297 F. 3d at 106. The documents were not turned over in an orderly manner; they were dumped into two file boxes labeled "3500 material," accompanied by a 41-page index designating over 600 exhibits, with no particular indication of what any of those exhibits might contain. Individual items of 3500 material were not Bates stamped and were not separated by witness. As a result, the defense in *Gil* did not discover the memo until after the trial was over. The Second Circuit concluded:

> Although the Bradford memo was produced before trial, the defense was not in a position to read it, identify its usefulness, and use it. It was among five reams of paper labeled "3500 material," delivered sometime on the Friday before a Monday trial, at a time presumably when a conscientious defense lawyer would be preoccupied working on an opening statement and witness cross-examinations, and all else. Moreover, disclosure on the eve of trial "may be insufficient unless it is fuller and more thorough than may have been required if the disclosure had been made at an earlier stage." [*Leka v. Portuondo*, 257 F.3d 89, 101 (2001)]. The two-page memo was not easily identifiable as a document of significance, located as it was among reams of documents, and indexed as Dorfman 3500 material on page twelve of the exhibit list.

*Gil,* 297 F. 3d at 106.

Even worse were the circumstances in *Leka v. Portuondo*, 257 F.3d 89, 101 (2001). There, the Circuit concluded that the Government violated Brady by suppressing the exculpatory testimony of an eyewitness who was not called at trial, when the substance of his testimony was not disclosed to defense and the prosecution actually sought an order foreclosing defense access to the witness.

In *United States v. St. Germain*, 2004 WL 1171403 (S.D.N.Y. May 11, 1004), this Court concluded that eve-of-trial disclosure of grand jury transcripts violated *Brady*. *Id*. at *16. Again, the facts surrounding the non-disclosure in *St. Germain* differ radically from the case at bar.

13

St. Germain, the former head of the Reutilization Department at IBM, was found guilty of "steering" business to a corporation known as Cerplex, from which he received kickbacks through a confederate (and former lover) named Linda Schultz. *Id* at *1. The Government's theory was that Schultz was planted at Cerplex by St. Germain to serve as a conduit for kickbacks to him. *Id*. At trial, Schultz testified that St. Germain had told her to contact Richard Davis and William Klein at Cerplex and they would set her up as a "sham" sales representative. *Id*. at *5. She said that Davis and Klein agreed to make her a sales representative, pretending that she would deal on Cerplex's behalf with IBM. This testimony supported the Government's theory– a theory that the Government develop just days before trial, when Schultz plead guilty and changed her story. *Id*.

The Defense argued that, far from being a "sham" sales representative, Schultz was a real sales rep for Cerplex in connection with its dealings with IBM. *Id*. The Grand Jury testimony of Davis and Klein supported the defense theory and contradicted the Government's. Both men testified in the grand jury that, *inter alia,* Schultz had introduced Cerplex to IBM, well before she was planted by St. Germain. *Id*.

Klein's and Davis's testimony was turned over several days before trial in "witness files" for the two men, along with the rest of the 3500 material, which suggested that the Government intended to call the men at trial. Because Schultz signed on as a Government witness only a week before the trial and the Government did not disclose its decision to reclassify Klein and Davis as co-conspirators until well into the trial (after Shultz testified), defense counsel had no reason either to focus on Klein or Davis witness folders as possibly containing material that could be used to impeach Schultz, or to contact the two men in the week leading up to the trial. Indeed, the exculpatory import of their grand jury testimony was not apparent until Schultz gave her testimony.

Until Schultz testified, there was no reason for anyone connected with the defense to know that Klein and Davis told the grand jury a different story than Schultz did at trial. *Id*. at *16. Therefore, there was no reason for the defense to assume that the Klein and Davis witness folders contained exculpatory information, and no reason for defense counsel to turn his attention to them immediately. *Id*

When the relevance of the grand jury testimony finally became apparent, defendant's attorney was in no position to do much about it. *Id*. The trial had begun. Counsel could not confront Schultz with Klein's and Davis's statements without knowing whether they would testify for the defense. But they were in California, a six hour plane ride away. *Id*. at *17. There was no guarantee that they would speak to St. Germain's lawyer. *Id*. And any chance that Davis and Klein would have cooperated with the defense evaporated several days latter, in mid-trial, when the Government identified both men as co-conspirators of St. Germain and Schultz. *Id*.

The circumstances here contrast markedly with those in *Gil*, *Leka* and *St. Germain*. First and foremost, there are no "five reams of documents" here as there were in *Gil*. There were only a total of 290 pages of *Giglio*/3500 material in this case. That material was produced in a redweld, with the pages that were relevant to each witness separately paper-clipped (albeit not marked with the witness's name). There were only 11 pages of material for Vitetta and 8 pages for Sarin. Defense counsel was told the order in which witnesses were expected to testify so that he could look for the documents relating to the first witnesses first. Given the small number of documents, they were not difficult to find.[2]

---

[2] The Government's only screw-up was not placing the documents relating to particular witnesses into separately labeled file folders. When the Government provides the Court with Jencks/Giglio material, it puts material for each witness in a separate file folder. I intend to

More significantly, the information contained in the supposedly suppressed documents both could be and was used at trial, to the best possible effect (which admittedly was not much).

The information was used to cross examine Vitetta and Sarin. (*See, e.g.*, Tr. 123-25, 186, 189-92 (cross-examining Sarin based on 3506-E, 3506-A and 3506-B); Tr. 154-57 (cross-examining Vitetta based on 3505-B and 3505-C)).  It was used to question the author of all but one of the supposedly suppressed documents, FBI Special Agent Kevin Conroy, who was called as a defense witness.  (*See* Tr. 770-76; 3506-A, 3506-B, 3505-B, 3505-C).  (Tr. 772-74).  It was used in summation to point out the disparity between the witnesses' trial testimony and their prior statement.  (Tr. 885-89).  Finally, defense counsel also used these inconsistencies to argue to the jury that there was a third man – the  man purportedly extorting defendant – at the scene of the crime on the day of the murder. *See* Tr. 885-86 ("I submit to you that John Vitetta saw a third person ... He told you he told the FBI, John Vitetta did, that there was another person that he saw ... the driver of the vehicle that he placed right in this spot ... ); Tr. 886-87 ([Sarin] gave a sworn statement [describing the driver as possibly white] ... You can't possibly look at Paul Douglas and think he's possibly white ... she saw someone else too, someone whose skin color is different than Paul Douglas ... That's the only way this statement makes sense, if there is someone else ... I submit to you that [Agent Conroy] didn't write it down wrong ... he had John Vitetta right there to ask him, to check with him any information that he wanted to check.").

As long as a defendant possesses *Brady* evidence in time for its effective use, the government does not deprive the defendant of due process by not producing it sooner.  Plainly, these documents

---

promulgate a rule requiring the Government to turn material over to defense counsel in the same manner that it provides to the Court.  However, with only 290 pieces of paper at issue, the failure to use labeled folders is not dispositive in this case.

were disclosed in time for them to be used effectively at trial: the proof of the pudding is that they were in fact used! There was thus no "suppression" of these documents within the meaning of *Brady. See, e.g., Coppa*, 267 F.3d at 144; *See also United States* v. *Frank*, 11 F. Supp.2d 322, 325 (S.D.N.Y. 1998).

Douglas claims that these descriptions were suppressed because they were not turned over in time for him to send an investigator to find and speak with Vitetta or Sarin or to follow up on any leads from the descriptions or from Vitetta or Sarin. (Mem. 6). This allegedly deprived him of an opportunity to review these descriptions with the witnesses before trial, to try to reconcile their inconsistencies or explain them or to follow any leads that could have been followed. (Mem. at 7).

Douglas, who bears the burden of demonstrating suppression, *see, e.g., Brunshtein*, 344 F.3d at 101, has made no proffer of any defense efforts made to locate or speak with Vitetta or Sarin, in person or by telephone, in the four days between disclosure of their prior statements and their testimony.[3] Nor has Douglas made any showing that these witnesses – one of whom saw Douglas dumping a body in the trunk of a car, the other of who saw him fleeing that scene, and both of whom the defense perceives to be "hostile" (Mem. 9) – would have been willing to speak with Douglas's representative prior to trial. They were not required to do so.

Moreover, defense counsel did not seek an adjournment of the proceedings so counsel or an investigator could try to speak with Vitteta and Sarin prior to trial. It is true that the Second Circuit in *Leka,* "refuse[d] to infer from the failure of defense counsel, when surprised at trial, to seek time to gather other information on [suppressed evidence], that defense counsel would have by-passed

---

[3] Douglas also makes no proffer of defense efforts, during the month the defense had to make them, to speak with Leticia Graham who, like Sarin, saw the car and driver that exited the parking lot.

the opportunity had the prosecutor apprised him of the [evidence] at a time when the defense was in a reasonable pre-trial position to evaluate carefully all the implications of that information." *Leka*, supra., 257 F.3d at 102 (quoting *United States v. Grant*, 498 F.2d 376, 382).  However, the Court of Appeals has never held – even in *Leka* – that seeking an adjournment (the classic remedy for belated disclosure of exculpatory information, *see e.g. United States v. Walton*, 217 F.3d 443, 450-51 (7th Cir.2000)), is not required when doing so could adequately remedy a late disclosure.

This is not a case like *St. Germain*. There, the exculpatory nature of the withheld information was not obvious from the face of the documents and could not have become obvious until mid-trial, when a last minute cooperator gave her testimony. At that point, the defense strategy was set, and would have been difficult if not impossible to change. Moreover, exploring the issue would have required interviewing a large number of witnesses in California and elsewhere, some of whom worked at a company whose principals had suddenly become identified as "co-conspirators," and who had reason to be hostile to everyone associated with the case.  No adjournment could possibly have remedied the Government's mistake.

Here, by contrast, the exculpatory nature of the information is obvious from the face of the documents. The allegedly suppressed information goes to the validity of the witness' identification of defendant and is classic fodder for cross examination, not the stuff of new theories.  Only two witnesses  are involved, and they worked within five miles of this courthouse.  They could have easily been approached by counsel or an investigator during a brief adjournment.  In such circumstances, defense counsel cannot simply refuse to seek an adjournment and then seek to tar the Government with a *Brady* violation.

2. <u>Favorable Evidence</u>

Evidence is favorable to the accused if it either tends to show that the accused is not guilty or impeaches a government witness. *United States* v. *Jackson*, 345 F.3d 59, 71 (2d Cir. 2003); *United States* v. *Gil*, 297 F.3d 93, 101 (2d Cir. 2002).  Douglas claims that the descriptions he alleges were suppressed were favorable in both senses:  because they could be used to impeach Vitetta and Sarin, "since [the statements] describe someone other than the 'one person' they claim they saw," (Mem. 7), and because the statements "raised the distinct possibility of the presence of someone else at the scene of the crime, which was central to Douglas' defense" and were "corroborative of Douglas' defense."  (Mem. 7).

The statements at issue were indeed favorable in the impeachment sense and, as discussed above, they were used as impeachment material. The inconsistent statements were not, however, favorable to the defense in the other sense – that is, they did not tend either to show that Douglas was not guilty or to corroborate his defense.

Douglas's defense was that someone else – a black man, darker skinned than Douglas himself, who had been shaking defendant down for money for many months – was the person who wanted to enter 1915-25 Central Park Avenue and  steal the money from the ATM machines there. He claimed that this unknown person killed Moran. And he claimed that he, Douglas, was coerced into taking the man to the Citibank facility and helping the man deal with the body.

Douglas took the stand in his own defense, and told a radically different story than the one about which Haye and  his cousin gave testimony. In pertinent part (that is, insofar as it relates to the allegedly suppressed statements), Douglas claimed that the real killer forced Moran to drive his (Moran's) own car from the south side of the parking lot to the spot where it was ultimately found

on the north side of the parking lot. (Tr. 514-16; 642). He testified that the car was moved immediately after Moran exited the Citibank facility (Tr. 513-14). The jury knew, from a bank camera photo that bore the date and time, that Moran left the bank a few minutes after 9 a.m. (*see, e.g.,* Tr. 249-50; 297). Douglas also testified that he (Douglas) dumped Mr. Moran's body into the trunk of his car, and then drove the SUV – alone, with no passenger in the car – out of the entrance to the parking lot at 1915-25 Central Park Avenue. (Tr. 550-51).

Sarin's signed statement, describing the driver of the SUV that was leaving through the parking lot entrance as "possibly white," does not corroborate Douglas's story. Nor would any statement by Sarin (if one had been made) that the driver was possibly "white, black or Hispanic." That is because, according to Douglas, *he himself* drove the SUV out of the parking lot. Douglas is not "possibly white" or Hispanic." As his able counsel pointed out to the jury, Douglas is indisputably a black man.

Moreover, Sarin does not place two men in the SUV when it drove away . And Douglas testified that he was alone in the SUV when he drove away. The man whom he blamed for Moran's murder had, according to defendant, left the scene on foot some time earlier. (Tr. 546) Therefore, nothing in Sarin's inconsistent statement to the FBI would have helped Douglas establish that another man beside himself was present at the scene of the crime. She saw no one except the person who was driving the car which Douglas admitted to driving. [4]

The allegedly suppressed statements given by Vitetta were similarly unhelpful to the defense as anything except impeachment. I will assume arguendo that Vitetta told Agent Conroy that the

---

[4] Interestingly, Douglas himself described this unknown man as being DARKER than he was (Tr. 454) – which makes the argument that Sarin's "possibly white" statement would have bolstered the defense all the more improbable.

person who sat in Moran's car while it was parked behind the building was darker skinned than the man he saw putting the body in the trunk. That, of course, would support Douglas's claim that a second black man, whose skin was darker than Douglas's own, was present at the scene of the crime. But according to Douglas' own testimony, Moran moved his car shortly after 9 a.m. – not an hour or so later, when Vitetta came out of the building to work on his car. (Tr. 158). During the brief period when Vitetta claimed that Douglas was moving Moran's car, defendant testified that he was sitting alone in the SUV, thinking about what to do next. (Tr. 547-48). In order to support Douglas's story, Vitetta would have had to see the darker skinned man flee on foot (Tr. 546) – not see him drive Moran's car. Vitetta's allegedly suppressed statement conflicts with, rather than supports, the defense that Douglas mounted.

In short, the statements that Douglas claims were suppressed are, at most, prior inconsistent statements made by witnesses who testified at the trial. They were turned over to the defense several days prior to the time the witnesses testified. They were used for their only possible purpose– to impeach Vitetta and Sarin. They did not tend to show that Douglas was not guilty, or corroborate the "mystery man" story he elected to tell the jury at trial.

### 3. Materiality and Prejudice

This component of the test for a *Brady* violation requires a court to ask whether the defendant:

> has established the prejudice necessary to satisfy the materiality inquiry. The touchstone of materiality is a reasonable probability of a different result. This is not a test for sufficiency of evidence; the defendant must show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*United States* v. *Jackson*, 345 F.3d 59, 73 (2d Cir. 2003) (citations and internal quotation marks

omitted).

Douglas claims that he suffered prejudice in this case because, when he cross-examined

Vitetta and Sarin with their prior statements, they

> [n]either embraced what they had said, but were vague or contrary about their statements and suggested they had been misquoted by law enforcement. There ... had been no opportunity, given the lateness of the disclosure, for the defense to interview Vitetta and Sarin, to go over their descriptions, to review the sequence of events, and to follow up on leads from their statements. Instead, the defense was stuck with their confusing and hostile answers on cross-examination.

(Mem. 9).

In essence, Douglas is saying that cross-examination, the "greatest legal engine ever invented

for the discovery of truth," *Lilly* v. *Virginia*, 527 U.S. 116, 124 (1999) (internal quotations marks

and citation omitted) was constitutionally insufficient, even though it was conducted four days after

receiving the witnesses' prior inconsistent statements. According to Douglas, *Brady* requires in

addition that he have been afforded more time before trial to obtain a pretrial audience with these

witnesses, in the hopes of thereby obtaining more favorable answers than he was able to obtain

through cross-examination, or unspecified leads that he could have then followed. But that is just

another way of saying that the statements were suppressed in the constitutional sense. For the

reasons discussed above, this argument lacks merit. Defendant had the statements in plenty of time

to make use of them at trial. And he failed to seek an adjournment if he thought time was

inadequate.

Even if the Government had turned the information over late (and it did not), defendant

suffered absolutely no prejudice. When courts have found prejudice, they have found that identified

evidence was not only favorable, but was sufficiently central to meet the relevant standard of

"put[ting] the whole case in such a different light as to undermine confidence in the verdict." *Id.*

Douglas fails to make the required showing that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Jackson*, 345 F.3d at 73.

In *United States* v. *Gil*, 297 F.3d 93 (2d Cir. 2002), the case on which Douglas principally relies, the evidence that was not turned over  consisted of a  memo written from one employee of the alleged victim to another, *id.* at 96, which defense counsel was unaware of during trial, *id.* at 97, in a fraud case where the defense was that the victim had authorized the allegedly fraudulent conduct, *id.* at 97-98.  The missing memo confirmed the existence of an agreement such as the one the defendant claimed he had entered into with his alleged victim, authorized the type of business practice the defendant claimed his alleged victim had authorized, and impeached one of the Government witnesses who disputed his claim of authorization.  *Id.* at 102-03.  As a result, the missing memo "had the potential to subvert ... radically" the background assumption underlying the prosecution -- that the victim expected to receive accurate invoices, rather than the inflated invoices that the defense claimed were authorized.  *Id.* at 102.  The missing memo also documented, *inter alia*, "an occasion at which ... a conversation [such as the claimed authorizing conversation] could be pinpointed" and "[the alleged victim's] disregard for contractual, accounting and formal considerations that together would add considerable force to [the defendant's] account." *Id.* at 104. In short, there was both identified evidence -- the memo -- and a litany of identified arguments that could have been made based on the memo.

Similarly, in *United States v. St. Germain, supra*., the suppressed evidence undermined the Government's central premise and cast the case against the defendant in a different light.  As stated above, in *St. Germain*, the Government turned over the grand jury testimony of Davis and Klein,

along with reams of other documents, on the eve-of-trial, all simply labeled 3500/Giglio material. Neither Davis nor Klein would be called as trial witnesses, because their grand jury testimony contradicted the Government's theory that Schultz (the central witness against the defendant) was planted at the Cerplex company by defendant, in furtherance of the fraudulent enterprise. The relevance of Davis's and Klein's testimony would not become apparent until the middle of Schultz's testimony, when the Government's theory that St. Germain installed Schultz at Cerplex first emerged. However, at the point, in the middle of the trial, geographic logistics (Davis and Klein were both in California) and the fact that the Government would shortly thereafter name both men as co-conspirators, effectively precluded counsel from conducting the necessary investigation to allow effective use of their exculpatory grand jury testimony. And since the Government called neither Davis nor Klein to testify at trial, the *Brady* violation could not be cured through their cross-examination. *See United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir.1988) (cross-examination can cure prejudice created by *Brady* violation).

In our case, as has been discussed above, the statements made by Sarin and Vitella to investigating officers do not cast the case against Douglas in a different light, in and of themselves, because they are not consistent with his story as told at trial. So Douglas is left to argue that if he had the opportunity to conduct interviews after receiving this information, he might have developed exonerative evidence. This argument is hard to swallow, both factually and legally.

Factually it is hard to swallow because there is absolutely no way to infer that defendant would have learned anything more in pre-trial interviews of Sarin and Vitetta than he did on his informed cross-examination. Sarin and Vitetta were in the parking lot, and in a position to observe anything, for but a few moments. Sarin got outside just in time to see the SUV pull out of its parking

spot and drive away. Sarin testified that she saw no one else in the parking lot at that time. (Tr. 188). (Tr. 174, 185-86) Douglas admitted that he was the person driving the SUV, and that the person he calls the real perpetrator had already fled the scene. (Tr. 546-47, 550-51). Similarly, Vitetta was in the parking lot for only a few minutes before he noticed Douglas dragging Moran's body from one car to the other. (Tr. 547-48). And he saw Moran's body being moved by the same man who dragged the body from one vehicle to the other, (according to him) long after Douglas testified that it was moved. So Vitetta saw nothing to corroborate Douglas's account of the second man. (Tr. 160).

It is highly significant that, when defense counsel cross examined Vitetta and Sarin about their prior statements during the trial, their answers yielded neither evidence favorable to the defense nor any leads that could have been followed by defense counsel had he learned of them earlier.[5] This strongly suggests that the defense suffered no prejudice, regardless of the timing of

---

[5] Both Sarin and Conroy cast doubt on the possibility that the allegedly inconsistent statements were ever actually made.

Sarin explained that she neither wrote nor dictated the statement she signed, (Tr. 193-94), did not then know it was a sworn statement, (Tr. 190), did not read it carefully before she signed it and did not notice the description of the race of the driver of the SUV in the document. (Tr. 189-90, 193-94). She also explained how it came to describe the driver of the SUV as "possibly white." She testified that the detective who wrote the document asked her to describe the driver of the SUV. She told him it was a black male. When the detective asked if he could have been white, she said "possibly." (Tr. 124, 194).

The statement attributed to Vitetta by the FBI agent who interviewed him(Conroy) was not simply a reference to the driver of the car's being darker-skinned than the man he saw place the body in the trunk. According to what Conroy wrote, Vitetta said two things: the driver who was in the vehicle that was parked next to his (Moran's) car initially was a darker skinned male than the person he saw place the body in the trunk; and that he (Vitetta) did not see "any other person besides the male who placed the body in the trunk.(3505-B). This makes no sense, since if Vitetta saw only one person, he could not possibly have seen anyone who was darker than that one person. Agent Conroy, called as a defense witness, professed confusion about what he had

25

disclosure.  Vitetta and Sarin simply did not have any information that it would have taken the defense time to develop and explore.

Legally, defendant's "what if" argument is beside the point.  Speculation about what might have been turned up is never sufficient to make out a *Brady* violation.  *McKenzie* v. *Poole*, 2004 WL 2671630 (E.D.N.Y. 2004) (no *Brady* violation; claim of prejudice because missing detective's notebook "might very well" have exonerated defendant was purely speculative).

Finally, the Court is fully satisfied that there was no miscarriage of justice here, no innocent man wrongly convicted. The reasons for confidence in the guilty verdict are many and powerful. The evidence includes Douglas's relatively contemporaneous statements to his cousin and friend about what he did at 1915-25 Central Park Avenue on April 22, 2004, and his reason for being there – including his statement that there was a delay in delivering the money (which he would have known only if he were in fact waiting for it);  his statement to Officer Blanchard when he surrendered to the Coral Springs Police Department;  the fact that Douglas was at the Yonkers Citibank site -- far from his home in Brooklyn -- early on the morning of April 22, 2004, a day a delivery of cash to the site was scheduled;  the fact that the SUV he was driving that day was found to contain items that a bank robber would want to have (a loaded shotgun, bulletproof vest, packed suitcase and identification documents);  Douglas's knowledge of when and how the ATM machines at that location were loaded; and the fact that the key to the Yonkers ATM site was missing from Moran's key ring.  Additionally,  Douglas's own trial testimony about what happened on April 22 (should anyone have believed it; this Court certainly does not) was tantamount to a confession that

---

been trying to say (Tr. 774), which suggests that the agent did not take Vitetta's statement down correctly.

both the unidentified man's effort to enter and rob the bank and the murder of Milton Moran.

Materiality and prejudice are analyzed in light of the totality of the trial evidence. Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin. The evidence against Douglas was anything but thin. It is, therefore, impossible to conceive of evidence that might have been elicited through pretrial interviews of Vitetta and Sarin that would put the whole case in such a different light as to undermine confidence in the verdict. *Cf. Gil*, 297 F.3d at 104. This may be why defendant has not ventured a guess as to what sort of exculpatory evidence he might have obtained from the interviews he did not conduct.

## CONCLUSION

Defendant's motion for a new trial is denied. Sentencing will go forward as scheduled on January 31, 2006, at 9:00a.m.

This constitutes the decision and order of the Court.

January 30, 2006

U.S.D.J.